Thank you. Good morning, Your Honors. Roger Siegel on behalf of the appellant, Mr. Lizarraga-Tirado. I'd like to reserve two minutes for rebuttal. Go ahead. Your Honors, it's, I think it's probably the most sacred, and I don't need to tell you this, it's the most sacred function of this Court in criminal cases to ensure that defendants receive their constitutionally mandated right to fair trial. This is one of the few cases I think that that did not happen. There were two, the two principal problems at trial deprived the defendant of two of his most fundamental rights, which deprived him of a fair trial, and both went to the heart of his defense. The first was his right to confrontation. Let me ask you, if this witness who testified about the location where she found the defendant had worked from a, say, a printed AAA map, and she had marked and said this is where I was, and I recognize that this is an accurate depiction of the area, would you be making the same argument about hearsay of the map? Would you have to bring somebody in from AAA to say this is a map? No. The problem as I see it is that the agent was not able to say and was not able to verify that these coordinates on the map matched with that arrow that pointed this is the place. So it's not the existence of the map that concerns you. It's whether the witness pointed properly to the place on the map. Is that right? Not that she pointed properly to it, but that it was that the one. She identified the place on the map. She identified it as the approximate location. I guess what I'm trying to focus on is whether the problem is actually with the physical map or with how she identified where on the map she says she was. Which is the problem here? The problem is that, at least in this particular case, the issue in terms of where the individuals were found had to do with the GPS coordinates, and there was a big issue about the GPS coordinates being mistaken. Do you have Exhibit 1? Yes. Maybe you should talk about your problem with reference to Exhibit 1. We can all look at it and you can point to us what you think is the hearsay on Exhibit 1. The hearsay on Exhibit 1 are the coordinates that are written down next to the pointer or the arrow. The little yellow pin thing. Yeah. Okay, you're having trouble finding it? What's that? You're having trouble finding Exhibit 1? I've got it. It's on page 10 of the Apolese supplemental excerpts, if no place else. I'm sure there are other places where it's found, too. Thank you, Your Honor. So you are not complaining about—let's see, have you got it in front of you? Yes. Okay, so you're not complaining about anything having to do with the topography or anything else, right? I'm not complaining about the photography, no. Topography. The topography. Yeah, where it shows mountains, you know, ridges, stuff like that. You're not complaining about that? I'm not saying that that's hearsay, no. Are you complaining about the place where it says United States? No. How about the little yellow line under the United States? No. How about where it says Mexico? No. You're not complaining about that? Are you complaining about the location of the pin? The location of the pin next to the— No, no, no. Are you complaining about the location of the pin on the map? Yes. So the location of the pin is a—without the numbers, just the pin. The location of the pin is a hearsay statement? Remember, the objection at trial was hearsay. Yes. Okay, whose hearsay is it? Hearsay of the map preparer because the—who we don't know who it was because— You mean Google? Excuse me? The map preparer? This is a satellite photo, as best I can tell. There was—in the record, the entire—all the references to this map were referenced as a map. It was never introduced— Well, but there was not a very specific objection at trial that says—the objection was, I object to all the hearsay on the map. So I'm trying to figure out what it is that all the hearsay is. The hearsay— Is the pin itself hearsay? The pin located next to the coordinates— Okay, you're not listening to my question. Is the pin itself hearsay? The fact that it's located there on the map as opposed to located six inches to the right or up above, is the pin itself— Yes, because it was not placed there by the declarant. So how is that different from my example of the AAA map? Because the agent testified that the tack or arrow indicates approximately where she was responding to that evening. So why is that different from somebody placing the X or saying, you know, I asked Joe to place the X in that place and it accurately shows where I was? I mean, because she could be cross-examined. Because one of the main issues in the case had to do with her misrecording the coordinates. And as of two months prior to trial, the coordinates, as of two months prior to trial, she had mistaken two incidents. So— Can you pull that microphone and just point it towards you? I'm sorry. If you're going to stand aside, that's fine. Just point it towards your mouth. Thank you. But isn't that exactly what cross-examining her is for? Not because there's anything wrong with the map, because she was available to be cross-examined about her mistakes and whether she was really sure that it was on this side of the mountains or that side of the mountains. The problem is that there was no witness to testify as to when he received the coordinates from her. Was it back immediately after the incident? Was it prior to May 19th when she realized her mistake? Was it post-May 19th? What did she say about the coordinates? I understand the government's argument is, you know, a Google map is reliable. It's judicially noticeable by this court under Rule 201. The problem is that the confrontation clause goes to something completely different, and that's— But the agent was confronted, and I don't understand why this is any different than having her physically mark something and say, this is where I was standing, and you can cross-examine and say, no, you weren't. You said something else here. You said something else there. It's very inaccurate. Because she specifically said that she was unable to—that she did not put that tact there or the coordinates, that the only thing that she was able to verify was that the minutes that she had recorded mathematically converted to the— I'm sorry, to the degrees that's represented on the map. All she could verify was the mathematical conversion. Are you saying that Agent Garcia had no personal knowledge of where this arrest occurred, and there was some unknown person who had decided where the arrest occurred and placed the tact there, which she simply was unable to verify? She was just accepting what some will call Mr. X decided was the place where the arrest occurred. Is that your point? She didn't know enough to be able to confirm that? My point is that the defense was based on the idea that they got lost, and it was supported by several things in the agent's own testimony. And because they got lost, there was an issue, a very large issue with respect to— I'm going to interrupt you. That's fine. And that came out. That was hot. There was good cross-examination on that at the trial, and the jury knew about that. But I'm talking about the hearsay rule. It's an out-of-court statement offered for its truth by somebody who can't be cross-examined. And this seems to me just like this is the intersection of Pleasant Street and Main Street in Amherst. I'm Agent Garcia. I know where the Bank of America is. Yes, that X right there is where I saw the guy leaving the bank after the bank robbery. She identified the spot from her own knowledge where it occurred. Or are you saying she couldn't identify the spot and somebody else did? This is where she thought that she was responding to. Right. But there was nobody to cross-examine with respect to where and when he got the coordinates. Did he get them at the time when she was mistaken, had mistaken this incident for an incident a few days earlier, which was her testimony, because she thought that one helicopter, she confused the helicopters and confused the incidents? Or was it at another time? There was nobody to test the reliability through cross-examination of how these numbers, when these numbers, because when these numbers got on the map, affect tremendous the entire analysis as to if the location, if they were given based upon her mistaken information, her mistaking this with the location. If it was the prior arrest, then clearly it can't be relied upon. And without somebody to, in order to cross-examine about not only when he received it and what she said about it, did she say that it was the place of apprehension? Did she say that it was the place where they responded from? All of those things are things that needed to be tested by the crucible of cross-examination. And, you know, what the margin of error was, all those sorts of things, whether the 2,000. But with or without that, she testified about what she did. She was there. She responded in her Chevy pickup truck or whatever it was. And even without that, she testified that it was, I think, six or seven miles north of the border. So I guess I'm not really sure why you think that she, that cross-examining her wasn't constitutionally adequate. She was the person who performed the arrest. Because probably the most important, in my opinion, piece of evidence that the jury saw, when the jury takes back to jury deliberations, a very scientific appearing map which shows to them this is the place where... You're challenging the numbers in relation to the pin. Is that what it is? That's the hearsay statement. You're challenging that where that pin is located... Correct. ...actually is the coordinates 31.7, whatever, as it appears on the map. That's your hearsay objection. That she could not testify to that and did not testify to that. And that's a hearsay statement. Your time is up. Thank you. Thank you. We'll hear from the government. May it please the Court, Ryan Ellersick for the United States. We're asking that the Court affirm the conviction in this case because... Do you have Exhibit 1? Yes, I do, Your Honor. Okay. You see the pin and the numbers? Yes, I do, Your Honor. Okay. This was a pin, and that indicates there's some numbers next to it which report to be the coordinates of that pin. Yes. And I understand the agent testified that those numbers match the numbers that she got on a handheld device when she checked the coordinates at the time of the arrest. How do we know that those numbers correspond to that actual location of the pin? Because that's — that is an issue of — or a fact that is essentially a scientific or mathematical certainty that the Court can take to its own. Are you sure that that is not coordinates for, let's say, the Pyramid of Giza or the Eiffel Tower? According to — Or the Sydney Opera House? According to Google Map, it's not. Well, let me hear. The clerk hand these to counsel. Take a look. You'll see that they actually correspond to the Pyramid of Giza. One of them goes to the other side. You'd recognize that the Sydney Opera House and the Eiffel Tower all have the same coordinates on these Google Map pictures. You recognize the numbers? Yes, Your Honor. Okay. How can that be, if it's a scientific fact? Your Honor, I don't know. I mean, she specifically asked whether she was responsible for putting the numbers in. Okay? And she said, I wasn't. Okay? So you have to admit that those numbers are hearsay. There is somebody preparing the Google Map that is certifying, I am putting in these coordinates in a way that they will correspond to the pin, right? And if that person is lying — and I'm not accusing anybody of lying, but I'm just saying if some person is lying, then those numbers will come out wrong. As a matter of fact, if you look, the last item I have there is the location of this pin on the same map, and the coordinates are those of the Eiffel Tower. So the reality is that you can create a Google Map like this with a pin and tell it — you see the last one there? We have the pin, and the coordinates are 48-.85 comma 2.29. Those are the coordinates of the Eiffel Tower. So doesn't creation of this map depend on the veracity of the — I mean, the map with the pin depend on the veracity of the mapmaker? I mean, the person who actually prints out the map? Well — That's missing, isn't it? I think the — what saves it in this case would be that the agent — well, one, we know the apprehension didn't occur in these various other locations because the agents both testified — Well, this may be harmless, you know, and that may be your argument. It didn't matter that these very precise numbers on the map didn't matter, didn't affect the jury at all because we had other testimony. And we did. And maybe it's harmless. But it's got to be error, isn't it? Well, and — It's got to be hearsay, and it's got to be error to have admitted it. What — I mean, it's a very precise statement. These are very precise numbers, the kind of things that impress juries. They sound scientific. You thought they were irrefutable, right? I did, Your Honor. I typed them into my own computer many times before testifying. Well, you typed them in a particular way. You typed them in a particular way that caused them to come up next to that pen. But you understand they can be typed in a different way that will show them wrong, right? No, I was not aware that that was the case. And I think what this Court's cases have said — Obviously, you went to law school too long ago. Apparently, Your Honor. But what this Court's cases have said on the Prey Array case, for example, which I think was the first time this Court said that the Court can take judicial notice of Google Maps as a — That's perfectly fine. We did say that. And insofar as we're talking about maps in general, we can accept the maps. And if somebody comes along and says, I live at Broadway and Main, and I'm looking at it on the map, and I recognize it to be Broadway and Main, then that's not hearsay, right? Well, I think there could be — But if somebody says Broadway and Main are these particular GPS coordinates, you don't know that. You can't verify that from your own knowledge. I guess what maybe I would draw the analogy to is if somebody had the address of 123 Jones Street, and there may be dozens of those throughout the country, and the agent writes down, this apprehension occurred at 123 Jones Street in Arizona in the desert, because that's where I work. We're about five miles from the border. We're north of the Onion Stand. And we were in this wash, this area where I'm very familiar with. It was at 123 Jones Street. She gives that — But the difference is there are no streets here. The map is entirely a topographical map that looks like any other piece of desert or mountain range. And everything that's communicative in here that identifies as being close — I mean, 123 Jones Street has an intersection. It has nearby streets. There's maple. There's leaf. There are streets in the vicinity. There's nothing about this map that would tell anybody that it's here as opposed to five miles north or five miles south other than those coordinates. That's true, Your Honor. But I guess my point is that in giving those coordinates — and, again, maybe the analogy is to 123 Jones Street. Maybe it's an isolated street in the middle of nowhere. But she gives those coordinates. Somebody puts that into a Google map and finds that there is — But we don't know how it was put into a Google map, right? It's not in the record. And so — And you do admit that that's hearsay, isn't it? No, I don't admit that. Why aren't these two coordinates on the map hearsay? Because without some explanation, there's really no assertion that can be ascertained from what that is. And it could have been — I think a reasonable person could look at that and say, well, those look like GPS coordinates. Maybe there's some assertion about a location, but what that location is, there's really no way to know. Without the agent who recorded those coordinates and has personal knowledge of the area, she's now at trial. And she's shown the exhibit. But she can't verify that those coordinates are at that point in the map. And she didn't do that. I have the examination here. It was really quite scant. She does not say, I know for a fact that these are the coordinates on the map. No, but — Somebody else did that. That's true, but she did say — And that person didn't testify. That's true, but she — And why isn't that hearsay? Why isn't the placement of the coordinates into the computer so they'll show up next to the pin, why isn't that an assertive statement made out of court, which is not subject to cross-examination? Well, I guess the difficulty I had in analyzing this issue was — Well, why don't you answer my question, and then you can tell me your difficulty. Why don't you deal with my difficulty first? Absolutely, Your Honor. Why isn't that an out-of-court statement by whoever it is that typed in those coordinates saying, I put them in, and I put them in in a way that they would correspond to the location of the pin? Well, because the — that's not the assertion that's coming through there. Well, of course it is. I mean, the assertion is that this pin is at those coordinates. And I suppose that to the extent there is an assertion — I mean, if you take away that assertion, all you've got is a map there with a yellow pin in it. Right? And some numbers next to it, so there's a pin — Well, but the numbers — unless the numbers — I mean, your agent on the stand testified that those numbers are the same numbers that she got on her GPS. Yes. Right? Yes. And so there was an assertion, those are the numbers I put on my — I had on my GPS when I arrested him. And that was her statement at trial. And then there was some statement that that pin is actually where those numbers are located. No, there was no statement to that effect. Well, there must, because that's what the map says. The map seems assert. We've got a pin, and the pin is at those coordinates, right? Well, I — without the agent's explanation, I don't know if there's any way that somebody could extract that assertion from the map. Well, what do you think the jury would see when it went back to the jury room and it looked at this? Without any explanation from the agent, they would have had to guess what the significance of that is. They may have thought — they probably could have put together this is pinpointing some location. They may not have known — And the fact that it's — they happen to be exactly the same numbers that the agent said were on her GPS when she arrested him, that means nothing. Well, and I guess what I'm saying is without any explanation. So if we had just admitted the map with no explanation from the agent at trial — Well, but there was no explanation. She said, I don't know. I didn't put the — I didn't prepare the map. But she did say the attack mark is approximately the location where we responded to you. And then she was later asked, is that a fair and accurate depiction of where this apprehension occurred? Yes. Because that would have been without the numbers. She could have said, you know, the pin is there, have no numbers next to it. But then she went one step farther and said, not only is it approximately where I found him, but those numbers correspond to the numbers that I looked up on my hand GPS when I arrested him. Yes. And so it was the agent. And our point is it's the agent who's, I guess, giving substance to the symbols on the map that otherwise would be meaningless. Or they would be subject to a variety of assertions. For example, it could have been where they were originally responding from, or it could have been where the camera operator was located when he first detected these three individuals. And so it was — Just to answer the question, because you're running out of time, I'm going to question another matter, which Judge Kosinski alluded to. Have you waived the harmless argument? Is that your brother suggests that you've waived any argument that the mistake, if there was a mistake, was harmless? Have you? We didn't argue harmless error. But I think under this Court's case law, I think this is a case where the Court could look at that, because the record in this case is not particularly voluminous. And we did, in the plain error section of our brief, we did go through the evidence and the strength of the evidence. And in our view, this was not a close case. And so we think — This is not a plain error case. It is an object. I'm sorry? This is not a plain error case. No. They did object. No. But all I'm saying is that I know the Court is reluctant to engage in harmless error analysis to a sponte, especially when the record is very voluminous and the Court doesn't want to be combing through that. All I'm saying is that in this case, the record is fairly minimal. And we did go through a type of a harmless error analysis in the — On the other issue. On the other issue. Because that's plain error review on the alleged prosecutorial misconduct claim. Similar analysis. So my point is, I think the Court can find that this was harmless, certainly because both agents unequivocally said this happened in the United States. They were several miles from the border. And so to the extent there is error in the admission of the map, we believe it is harmless. Okay. Thank you. You are out of time. Would you like to take a minute for rebuttal? You don't have to. Okay. Case is argued. We'll stand submitted.
judges: Ponsor, Kozinski, Graber